UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
GENOWEFA ZARANSKA,

             Petitioner,                                <u>Report and Recommendation</u>
                                                       MISC-04-0169 (FB) (JMA)

    -against-

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, et al.,

             Respondents.
------------------------------------------------------------X
A P P E A R A N C E S:

Przemyslaw Jan Bloch, Esq.
26 Court Street, Suite 2113
Brooklyn, NY 11242
Attorney for Petitioner

Roslynn R. Mauskopf
United States Attorney
Eastern District of New York
One Pierrepont Plaza, 14th Floor
Brooklyn, NY 11201
        By:     Scott Dunn
                Assistant United States Attorney

AZRACK, United States Magistrate Judge:

      By Order of December 13, 2004, the above-captioned action was referred to me by the

Honorable Frederic Block for a report and recommendation on respondent United States Department

of Homeland Security's motion to dismiss petitioner Genowefa Zaranska's application for a hearing on

her naturalization application.  Because I find that the federal courts have exclusive jurisdiction over

petitioner's naturalization application, I recommend that the motion to dismiss be denied and that the

matter be adjudicated in accordance with 8 U.S.C. § 1447(b) (2005).  Respondents move in the

alternative for summary judgment denying the naturalization application itself, on the grounds that

petitioner is ineligible for naturalization. I recommend that the court deny respondents' motion for

summary judgment. This is because I do not find petitioner ineligible for naturalization, as she has never

been convicted of a crime involving moral turpitude.


## I. Background

Petitioner is a Polish national seeking naturalization. She filed an application with the then-

Immigration and Naturalization Service ("INS"), now Department of Homeland Security Bureau of

Citizenship and Immigration Services ("CIS") on February 23, 1998. On April 18, 2000, petitioner

appeared for an examination on her naturalization application. The examination was conducted and a

decision on her application reserved. Petitioner thereafter attempted to determine the status of her

application. By letter and personal visit of counsel in 2004, she requested information on the status of

her application. Neither petitioner nor her attorney received any response.

Petitioner therefore applied to the court under 8 U.S.C. § 1447(b) (2005) on July 7, 2004, to

accept jurisdiction over the naturalization application and to adjudicate it, or to remand the application

with instructions to CIS to adjudicate. Petitioner contends that section 1447(b) grants the district court

exclusive jurisdiction over her naturalization application, that is, by virtue of her application for a hearing

in federal court, jurisdiction has been stripped from CIS, because the agency did not make a decision

on her application within 120 days of her examination. By Order of July 21, 2004, Judge Block

demanded respondents show cause why petitioner should not be granted citizenship. Respondents

attempted to do so in their motions to dismiss the petition, and in the alternative, for summary judgment,

alleging i) that when CIS denied petitioner's application for naturalization on August 5, 2004, the

application made in federal court became moot; ii) that petitioner has not exhausted administrative

remedies for the denial of her application; and iii) that the application for naturalization must be denied

because petitioner cannot show that she is a person of good moral character as required by the relevant

statutes.  Respondents based their conclusion that petitioner cannot demonstrate good moral character

on a conviction in her past.  The conviction arose from petitioner's guilty plea on November 2, 1994, to

Assault in the Second Degree (N.Y. Penal Law § 120.05) (McKinney 2005), in Supreme Court,

Kings County, for which she was sentenced, January 6, 1995, to a term of five years probation.

Respondents' motion to dismiss requires me to analyze a federal statute and recommend to the

court an interpretation of the statute.  Because I find that the statute confers on the court exclusive

jurisdiction over petitioner's application, I also make a recommendation on how the court should

determine respondents' motion for summary judgment on the naturalization application itself.

## II.  Motion to Dismiss

### A.  Standard of Review

Respondents dispute the court's jurisdiction.  Under Rule 12(b)(1) of the Federal Rules of Civil

Procedure,

> [a] case is properly dismissed for lack of subject matter jurisdiction under Rule
> 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate
> it.  See Fed. R. Civ. P. 12(b)(1).  In resolving a motion to dismiss for lack of subject
> matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence
> outside the pleadings.  See Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011
> (2d Cir. 1986).  A plaintiff asserting subject matter jurisdiction has the burden of
> proving by a preponderance of the evidence that it exists.  See Malik v. Meissner, 82

F.3d 560, 562 (2d Cir. 1996).

Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).


B.  Statutory Interpretation

This case requires me to analyze section 1447(b) of Title 8.  I am aided in this endeavor by a

unanimous en banc decision of the United States Court of Appeals for the Ninth Circuit.  See United

States v. Hovsepian, 359 F.3d 1144 (2004) (en banc).  The Ninth Circuit in Hovsepian conducted a

review of the text of section 1447(b), the context of statutory provisions, and the intent of Congress in

enacting the statute.  The court concluded that the statute grants exclusive jurisdiction in the federal

courts in the situation, as here, where CIS did not decide an naturalization application 120 days after

the agency examined the applicant, and the applicant thereafter applied to federal court for a hearing.

Hovsepian, 359 F.3d at 1159-64.  I agree with the Ninth Circuit's methods and result.

1.  Text of Section 1447(b)

When interpreting the meaning of a statute, the analysis begins with the statutory language.  In re

Edelman, 295 F.3d 171, 177 (2d Cir. 2002).  The statute provides:

> If there is a failure to make a determination under section 1446 before the end of the
> 120-day period after the date on which the examination is conducted under such
> section, the applicant may apply to the United States district court for the district in
> which the applicant resides for a hearing on the matter.  Such court has jurisdiction over
> the matter and may either determine the matter or remand the matter, with appropriate
> instructions, to the Service to determine the matter.

8 U.S.C. § 1447(b).  Read alone, this statute wrests jurisdiction from a delinquent federal agency and

places it instead with the federal courts.  After the applicant for naturalization applies to the district court

4

for a hearing, "[s]uch court has jurisdiction over the matter" and may do one of two things: i) "determine the matter"; or ii) "remand the matter, with appropriate instructions, to the Service to determine the matter." See Hovsepian, 359 F.3d at 1160 ("This wording shows that Congress intended to vest power to decide languishing naturalization applications in the district court *alone*, *unless* the court chooses to 'remand the matter' to the INS, with *the court's* instructions") (emphasis in original).

Respondents denied petitioner's application after she had applied for a hearing in federal court. It appears, then, that respondents interpret the statute to mean that the agency can determine the matter, even after an applicant for naturalization has applied for a hearing in federal court. The language of the statute, however, does not support this result. Respondents take care in their papers not to explicitly argue that CIS and the courts share jurisdiction over an application once the applicant has applied for a hearing. Respondents choose instead to argue that an entirely different statutory provision governs. But to accept the results of their reading of the statute would mean just what I have said above, that the federal courts share jurisdiction with CIS even after an applicant has applied to the court for a hearing and after the court has jurisdiction over the application. The process described in the statute would be routinely disrupted, however, if CIS could deny the application for naturalization after an applicant has applied for a hearing. The statute would make no sense if the court can determine the application or remand it to the agency with instructions to determine it, if all along the agency could make the determination itself and its determination would "moot" the district court's adjudication. See Hovsepian, 359 F.3d at 1160 ("Congress empowered the district court to remand the matter to the INS with the court's instructions. The INS's proposed scheme would, in essence, reverse the hierarchy by allowing the INS to dictate, or at least severely limit, the conditions of

remand."). There would be no need for the statute to offer the court the option of remanding the matter to the agency if the agency was able to act on the application all along. Thus, the plain language of the statute establishes that when an application is made to the federal court for a hearing on a stalled naturalization application, the court has jurisdiction over the application. CIS accordingly loses jurisdiction, unless and until the matter is remanded back to it, perhaps with instructions from the court.

Respondents cite Langer v. McElroy, No. 00 Civ. 2741, 2002 U.S. Dist. LEXIS 23847 (S.D.N.Y. Dec. 16, 2002), for the proposition that the court's jurisdiction is mooted by an agency denial subsequent to the filing of an application with the court. The court in Langer v. McElroy, however, found that the process of applying for a hearing was unavailable to the applicant in that case at all because the agency had rendered its decision denying naturalization long before the applicant went to the court. See Langer v. McElroy, 2002 U.S. Dist. LEXIS 23847 at *7 (finding that because the INS had approved the application before the applicant applied to the federal court, there was no warrant for section 1447(b) to operate). The decision in Bahet v. Ashcroft, No. 01 Civ. 9334, 2002 U.S. Dist. LEXIS 10196, *2 (S.D.N.Y. Apr. 11, 2002), provides no more support for respondents' proposition. In that case it was the applicant himself who foreclosed federal court review by requesting as relief an order of mandamus to the INS to act. Once the INS had acted, the request for relief was seen by the court as mooted. See Bahet, 2002 U.S. Dist. LEXIS 9334, at *1-*2. Petitioner in this case does not request mandamus; she instead requests just what section 1447(b) says she is entitled to–the court to take jurisdiction of her case. Respondents cite as well to a Fourth Circuit case which found "that the plain language of § 1447 suggests the district court requires an unreviewed application in order to make a determination, and that the INS' denial of naturalization shortly after [the applicant in

that case] filed suit mooted the case and deprived the court of jurisdiction." <u>Kia v. INS</u>, No. 98-2399, 1999 U.S. App. LEXIS 5808, *3 (4th Cir. Mar. 30, 1999). To the extent <u>Kia</u> would dictate a different result from the one I conclude here, I disagree with it and conclude that the "plain" language says the opposite. I note that immediately following the above language in <u>Kia</u>, the <u>Kia</u> court cited for support <u>Sze v. INS</u>, 153 F.3d 1005 (9th Cir. 1998), a case that was specifically distinguished and overruled by <u>Hovsepian</u>. <u>See</u> <u>Hovsepian</u>, 359 F.3d at 1161 (distinguishing <u>Sze</u> on the grounds that the <u>Sze</u> plaintiffs had brought a test case urging the court to issue a writ of mandamus to the INS to act on stalled naturalization applications, and never asked the court to decide the application itself). Thus, in this situation the plain language of the statute places exclusive jurisdiction in the district court.

      2.  Statutory Context

Respondents contend that section 1447(b) is inapplicable because the naturalization application has been denied by CIS, and section 1447(b) involves a failure to make a determination (and the provision is so entitled). They contend that this matter is governed by a different statute, one regarding (naturally) denials of naturalization applications. Under the title "Judicial Review," that statute provides:

> A person whose application for naturalization under this title is denied, after a hearing before an immigration officer under section 1447(a), may seek review of such denial before the United States district court for the district in which such person resides . . . . Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.

8 U.S.C. § 1421(c) (2005).

The words of a statute must be read in their context and in consideration of their place in the overall statutory scheme. <u>FDA v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 132-33

(2000).  Respondents cite the canon of statutory interpretation which counsels that when two statutes

are in conflict, the one more specific should control over the one more general, especially if the more

specific is later in time.  Id. at 133.  Respondents also ask that the provisions be read harmoniously.

See id. ("A court must [] interpret the statute as a symmetrical and coherent regulatory scheme, and fit,

if possible, all parts into an harmonious whole").[1]  Statutes should additionally be interpreted such that

every clause and word of the statute, if possible, be given effect.  United States v. Menasche, 348 U.S.

528, 538-39 (1955).  Following the above canons of construction, what emerges is a scheme that

allows for de novo review by the federal court of either an agency denial of naturalization or of the

agency's failure to act.

Under section 1421(c), if an applicant is denied naturalization, after exhausting her

administrative remedies, she may apply to the federal court for a de novo determination of the

application.  If the applicant so requests, the court must hold a hearing de novo on the application.  The

court's determination under this provision is not limited at all by what the agency may have determined

in its own consideration of the application, given that the court is to arrive at its own findings of fact and

conclusions of law after de novo review.  Under this provision, the federal court has the final word on

the application for naturalization.

Likewise, under section 1447(b), where CIS has failed to act on an application for

naturalization, the applicant may petition the court for a hearing.  The court has jurisdiction to determine

_____

[1] Cf. Boatswain v. Ashcroft, 267 F. Supp. 2d 377, 380 (E.D.N.Y. 2003) ("Wading through
the statutory scheme is not a simple task because, as legal commentators have observed, the
immigration laws are a patchwork, containing numerous inconsistencies and vagaries.") (citations and
internal quotation marks omitted).

the matter, or if it prefers, the court can remand the matter back to CIS.  To read these provisions

together, it makes sense that the court's review is the same in either case; that is, the court gets the final

word on naturalization applications regardless of whether or not CIS has made a determination.

These statutory provisions are not in conflict, thus, there is no reason to defer to the more

specific one, if that is what section 1421(c) is.  To read the statute the way CIS wants me to read it,

section 1447(b) would essentially disappear, it would be rendered surplusage.  See Menasche, 348

U.S. at 539.  This is because any time an applicant, frustrated with the agency's failure to act,

petitioned the court, the agency could deny the naturalization application and render the application for

a hearing moot and section 1447(b) inoperable.

> In the light of § 1421(c), therefore, § 1447(b) is best viewed as a mechanism by which
> naturalization applicants who are impatient with INS delay may skip the agency's
> analysis of their application and proceed directly to the step in which the district court
> conducts a de novo review of the application.  In other words . . . the district court has
> the final word concerning denial of a naturalization application in one of two ways:
> either the INS fails to act in a timely manner, in which case the applicant may obtain a
> hearing and de novo proceeding in district court; or the INS acts unfavorably, in which
> case the applicant may obtain a hearing and de novo review in district court.

Hovsepian, 359 F.3d at 1162-63.  If the provisions were part of a harmonious whole, they would not

countenance the outcome respondents request here.  The agency did not act on petitioner's application.

She was therefore forced to apply to the court to accept jurisdiction and decide the application itself

under section 1447(b).  Then, the agency purported to deny the application and inform the court that it

had done so.  Petitioner, according to CIS, is therefore left to exhaust her administrative appeals.

Upon a presumed affirmance of the agency's denial, sometime in the future, she will be back here in

federal court, asking for de novo review of the agency's action.  The court will then have to rummage

through its old files, dust off petitioner's application, and take up the very review it began (or perhaps completed) when the initial application was made.        The court in <u>Langer v. McElroy</u> pointed out that "[t]he immigration statutes create two specific points at which a district court may intervene in the naturalization process[,]" and then cited sections 1447(b) and 1421(c).  <u>See</u> <u>Langer v. McElroy</u>, 2002 U.S. Dist LEXIS 23847 at *6 ("First, if the INS fails to render a decision upon an application within 120 days of the applicants' naturalization examination, the applicant may apply to [federal court for a] de novo hearing on the application, and the court may then determine the matter for itself or remand to the INS with instructions.  Second, if the INS denies a naturalization application – and that denial has been confirmed after an administrative appeal . . . the disappointed applicant may seek de novo judicial review of the denial in the United States district court for the district in which she resides.") (citations omitted).  Considering these statements, and faced with the situation in this case, the court in <u>Langer</u> might very well agree with my conclusion.  Respondents base all of their arguments on the premise that the applicant's act of applying to federal court for a hearing has no legal significance, but under the language of the statute that is not so.  Reading the provisions together supports the conclusion that section 1447(b) controls where a petitioner makes her application for a hearing after 120 days elapsed after the CIS examination but before CIS acts on the naturalization application.

3.  Intent of Congress in Enacting Section 1447(b)

Where Congress has made its intent clear, the courts must give effect to that intent.  <u>Zadvydas v. Davis</u>, 533 U.S. 678, 696 (2001).  The intent of Congress in enacting the statute, and specifically section 1447(b), included speeding up the naturalization process, reducing the burdens on the agency and the courts, and ensuring consistency and fairness in naturalization decisions.  <u>See</u> <u>Hovsepian</u>, 359

F.3d at 1163, <u>citing</u> H.R. Rep. No. 101-187, at 8, 12-13 (1989) and 135 Cong. Rec. H4539-02,

H4542 (statements of Rep. Morrison and Smith).  A review of the House Judiciary Committee Report

supports a determination that Congress intended to streamline and speed up the naturalization system.

<u>See</u>, <u>e.g</u>., H.R. Rep. No. 101-187, at 8 (by vesting the authority to confer citizenship in the Attorney

General "[t]he legislation streamlines the process towards citizenship"); <u>id</u>. at 11 (noting that there was

no national uniformity in decision making on naturalization applications) (citation omitted); <u>see also</u> <u>id</u>. at

11-12 (recognizing that the difficult cases, such as those involving a contention that an applicant is not of

good moral character, "sometimes are placed on the 'backburner' due to agency indecisiveness").  This

intent would be consistent with placing jurisdiction with the courts after the agency has forfeited such

jurisdiction through inaction.  <u>See</u> H.R. Rep. No. 101-187 at 11 ("Naturalization is an act of great

personal consequence to American Immigrants, involving major reorganizations in their sense of identity

and offering a new beginning for many.  Accordingly, the Committee emphasizes that the paramount

consideration of this legislation and its implementation should be the applicants.") (citation omitted).

Under the heading "Judicial Review," the Committee stated:

> The bill provides that decisions to deny citizenship may be appealed to the U.S.
> District Court and re-evaluated de novo.  The Committee strongly believes that
> although few cases for naturalization have been denied, citizenship is the most valued
> governmental benefit of this land and applicants should receive full recourse to the
> Judiciary when the request for that benefit is denied.

> In order to conform [the bill] to current practices which allow a "motion to
> calendar" where there are significant timelags in decisionmaking, the bill provides that
> the applicant may petition the court after 90 days of the interview on an application if a
> decision has not been made on the case.  Upon petitioning the court, jurisdiction for
> decisionmaking and conducting the final oath of citizenship lie with the court.  It is
> expected that INS will move expeditiously after full investigation of the facts to calendar
> cases for examination and decision.  Although in some circumstances the need for

additional fact finding and processing time would be justified, these complex cases must come to resolution at some point, and if a decision is not rendered in a timely fashion, the Committee believes the petitioner is entitled to a decision and hearing on the case.

H.R. Rep. No. 101-187, at 14.  The legislative history, in addition to the plain language of the statute, is evidence of Congress' intent to streamline the naturalization process and create remedies for individuals whose applications have been stalled or denied.  My reading of the statute is consistent with the aims of the legislation.

Having determined that the court has jurisdiction to determine the application or remand it with instructions to CIS, I recommend that respondents' motion to dismiss be denied, and I further respectfully recommend a decision on the naturalization application itself.

III.  Motion for Summary Judgment

Respondents argue that if the court refuses to dismiss petitioner's application, the court should still grant summary judgment to respondents because petitioner is ineligible for naturalization.  They contend petitioner's ineligibility results from her conviction for a crime involving moral turpitude in the five years prior to her application for naturalization.  This is the same ground upon which respondents purported to deny petitioner's application on August 5, 2004.  Petitioner's reply in opposition does not address respondents' motion for summary judgment and petitioner does not attempt to establish that she is eligible for naturalization.  See Petitioner's Reply of June 25, 2005 (entitled "Plaintiff's Answer and Memorandum of Law in Opposition to Defendants' Motion to Dismiss or for Summary Judgment").  The motion for summary judgment should be denied nonetheless as it is based on a question of law which can be decided by the court without the benefit of a reply from petitioner.

Summary judgment should be denied as I conclude that a second degree assault, in which a police officer is injured when the assaulting party intentionally interferes with the officer's lawful duty, is not a crime involving moral turpitude.


A.  Standard of Review

Summary judgment may not be granted unless the moving party demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor.  <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 255 (1986).  "[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  <u>Id</u>. at 250.


B.  The Naturalization Application

An applicant for naturalization bears the burden "to show eligibility for citizenship in every respect," <u>INS v. Pangilinan</u>, 486 U.S. 875, 884 (1988), and must strictly comply with the requirements for citizenship articulated by Congress.  <u>Federenko v. United States</u>, 449 U.S. 490, 506-07 (1981). When doubt exists, it must be resolved in favor of the government.  <u>Berenyi v. District Dir</u>., 385 U.S. 630, 637-39 (1967); <u>see</u> <u>Boatswain v. Ashcroft</u>, 267 F. Supp. 2d 377, 383 (E.D.N.Y. 2003).

An applicant for naturalization has the burden of demonstrating that she was and is a person of good moral character.  8 U.S.C. § 1427(a) (2005); 8 C.F.R. § 316.10(a)(1) and (2).  Good moral

character must be demonstrated for "the five years immediately preceding the date of filing" of a

naturalization application.  8 U.S.C. § 1427(a)(3).  However,

> [n]o person shall be regarded as, or found to be, a person of good moral character
> who, during the period for which good moral character is required to be established, is,
> or was . . . a member of one or more of the classes of persons, whether inadmissible or
> not, described in . . .  subparagraphs (A) and (B) of [8 U.S.C. § 1182(a)(2)] and
> subparagraph (C) thereof of such section . . . if the offense described therein, for which
> such person was convicted or of which he admits the commission, was committed
> during such period[.]

8 U.S.C. § 1101(f) and (f)(3) (2005).  Section 1182(a)(2)(A), in turn, provides that "any alien

convicted of . . . a crime involving moral turpitude (other than a purely political offense) . . . is

inadmissible."  8 U.S.C. § 1182(a)(2)(A)(i) and (i)(I) (2005).  The safeharbor provision of section

1182 provides relief from the section's application to noncitizens

> who committed only one crime if . . . the maximum penalty possible for the crime of
> which the alien was convicted . . . did not exceed imprisonment for one year and, if the
> alien was convicted of such crime, the alien was not sentenced to a term of
> imprisonment in excess of 6 months (regardless of the extent to which the sentence was
> ultimately executed).

8 U.S.C. § 1182(a)(2)(A)(ii)(II).  The safeharbor provides no protection to petitioner, because by her

guilty plea of November 2, 1994, she was convicted of Assault in the Second Degree (N.Y. Penal Law

§ 120.05).[2]  And as a class D felony under New York law, the maximum penalty for

--------------------------------

[2] The statute reads, in its entirety:

§ 120.05.  Assault in the second degree

A person is guilty of assault in the second degree when:

1. With intent to cause serious physical injury to another person, he causes such injury
to such person or to a third person; or

2. With intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; or

3. With intent to prevent a peace officer, police officer, a fireman, including a fireman acting as a paramedic or emergency medical technician administering first aid in the course of performance of duty as such fireman, an emergency medical service paramedic or emergency medical service technician, or medical or related personnel in a hospital emergency department, from performing a lawful duty, by means including releasing or failing to control an animal under circumstances evincing the actor's intent that the animal obstruct the lawful activity of such peace officer, police officer, fireman, paramedic or technician, he causes physical injury to such peace officer, police officer, fireman, paramedic, technician or medical or related personnel in a hospital emergency department; or

4. He recklessly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument; or

5. For a purpose other than lawful medical or therapeutic treatment, he intentionally causes stupor, unconsciousness or other physical impairment or injury to another person by administering to him, without his consent, a drug, substance or preparation capable of producing the same; or

6. In the course of and in furtherance of the commission or attempted commission of a felony, other than a felony defined in article one hundred thirty which requires corroboration for conviction, or of immediate flight therefrom, he, or another participant if there be any, causes physical injury to a person other than one of the participants; or

7. Having been charged with or convicted of a crime and while confined in a correctional facility, as defined in subdivision three of section forty of the correction law, pursuant to such charge or conviction, with intent to cause physical injury to another person, he causes such injury to such person or to a third person; or

8. Being eighteen years old or more and with intent to cause physical injury to a person less than eleven years old, the defendant recklessly causes serious physical injury to such person; or

9. Being eighteen years old or more and with intent to cause physical injury to a person less than seven years old, the defendant causes such injury to such person; or

second degree assault is seven years in prison.  See N.Y. Penal Law § 70.00(2)(d) (McKinney 2005).

Because petitioner was convicted of a crime for which the maximum penalty exceeds one year, and

because she was convicted of the crime within the five year statutory period, if the New York assault in

the second degree is a crime involving moral turpitude, petitioner is ineligible for naturalization.

The question this case thus poses is whether second degree assault in New York is a crime

involving moral turpitude.  "Moral turpitude" historically has referred to conduct which "is inherently

base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between

persons or to society in general."  Matter of Torres-Varela, 23 I. & N. Dec. 78, 83 (BIA 2001).  In

other words, there is no useful definition for the term.[3]  Nevertheless, whether a crime involves moral

_____

10. Acting at a place the person knows, or reasonably should know, is on school
grounds and with intent to cause physical injury, he or she:
    (a) causes such injury to an employee of a school or public school district; or
    (b) not being a student of such school or public school district, causes physical
injury to another, and such other person is a student of such school who is attending or
present for educational purposes. For purposes of this subdivision the term "school
grounds" shall have the meaning set forth in subdivision fourteen of section 220.00 of
this chapter.

11. With intent to cause physical injury to a train operator, ticket inspector, conductor
[fig 1] , bus operator or station agent employed by any transit agency, authority or
company, public or private, whose operation is authorized by New York state or any
of its political subdivisions, he or she causes physical injury to such train operator, ticket
inspector, conductor [fig 2] , bus operator or station agent while such employee is
performing an assigned duty on, or directly related to, the operation of a train or bus.

Assault in the second degree is a class D felony.

[3] "Time has only confirmed Justice Jackson's powerful dissent in [Jordan v. De George, 341
U.S. 223 (1951)], in which he called 'moral turpitude' an 'undefined and undefinable standard.'  341
U.S. at 235.  The term may well have outlived its usefulness.  But that is not for us to decide . . ."  Mei
v. Ashcroft, 393 F.3d 737, 741 (7th Cir. 2004).

16

turpitude is a question of law to be decided by the court.  See Michel v. INS, 206 F.3d 253, 262 (2d Cir. 2000) ("[A] determination that the elements of a crime constitute moral turpitude for [immigration purposes] is a question of law") (citation omitted); Abimbola v. Ashcroft, 378 F.3d 173, 176 (2d Cir. 2004).

It is the practice in the Second Circuit to perform a categorical review of whether a crime involves moral turpitude; this means that the court looks only to the statute and not to the actual circumstances of the crime in a particular case.  See Dalton v. Ashcroft, 257 F.3d 200, 204 (2d Cir. 2001) ("In this Circuit, we have long endorsed categorical analyses of criminal statutes in the context of deportation orders for crimes of moral turpitude").  "The categorical approach focuses on 'the intrinsic nature of the offense rather than on the factual circumstances surrounding any particular violation.'" Dickson v. Ashcroft, 346 F.3d 44, 48 (2d Cir. 2003), quoting Dalton, 237 F.3d, at 204; Abimbola, 378 F.3d at 176-77 ("We must ask whether every set of facts violating a statute . . . satisfies the criteria for removability, keeping in mind that only the minimum criminal conduct necessary to sustain a conviction under a given statute is relevant") (citations and internal quotation marks omitted).  The "touchstone" of moral turpitude is an evil or malicious intent.  Michel v. INS, 206 F.3d at 263.  Thus, courts look to the element of intent, specifically an evil or vicious intent, in the determination of whether a crime involves moral turpitude.  Id. ("Among the tests to determine if a crime involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind"), quoting Hamdan v. INS, 98 F.3d 183, 186 (5th Cir. 1996); see also Kamagate v. Ashcroft, 385 F.3d 144, 150 (2d Cir. 2004) (citing Jordan v. De George, 341 U.S. 223, 227 (1951), for the proposition that "fraud has ordinarily been the test to determine whether crimes not of the gravest character involve moral turpitude").  A

review of the United States Department of Justice Board of Immigration Appeals ("BIA")'s moral

turpitude cases noted some general results relevant here: according to the BIA, simple assault is not a

crime of moral turpitude, but assault with a deadly weapon is; a conviction for misconduct that caused

bodily injury is not a crime of moral turpitude, but where the conduct caused serious bodily injury, it is.

See Toutounjian v. INS, 959 F. Supp. 598, 603-4 (S.D.N.Y. 1997).

In Toutounjian, the court utilized the BIA's framework for establishing whether a prior

conviction was for a crime of moral turpitude:

> In determining whether a crime involves moral turpitude, we are limited in the first
> instance to an examination of the statute wherein the crime is defined.  If the crime as
> defined does not necessarily of its essence comprehend moral turpitude, then the alien
> cannot be said to have committed a crime involving moral turpitude.  Where, however,
> the statute is divisible or separable and so drawn as to include within its definition
> crimes which do and some which do not involve moral turpitude, the record of
> conviction, i.e., the information (complaint or indictment), plea, verdict and sentence
> may be examined to ascertain therefrom whether the requisite moral obloquy is present.

Toutounjian v. INS, 959 F. Supp. at 601, quoting Matter of P., 2 I. & N. Dec. 117, 119 (BIA 1944).

This is also a fair construction of the Second Circuit's review.  See United States ex rel Zaffarano v.

Corsi, 63 F.2d 757, 758 (2d Cir. Mar. 30, 1933).

I must first consider whether section 120.05 of the New York Penal Law is a divisible statute

which includes some crimes involving moral turpitude and some that do not.  The predecessor statute

was considered divisible by the Second Circuit.  See United States ex rel Zaffarano v. Corsi, 63 F.2d

757, 758 (2d Cir. Mar. 13, 1933) ("Many of the crimes [in the predecessor statute] plainly involve

moral turpitude. . . .  But this is not true of all assaults included within the section.").  It is long the law in

the Second Circuit that assault with a deadly weapon is a crime of moral turpitude, and thus subdivision

2 is a crime involving moral turpitude. See Zaffarano, 63 F.3d at 758 ("It is conceded that assault with a dangerous weapon would be of this character"), citing United States ex rel. Ciccerelli v. Curran, 12 F.2d 394 (2d Cir. 1926). All of the subdivisions of section 120.05, except subdivision 3 and subdivision 6, have an explicit requirement that the perpetrator intend to cause either physical injury or serious physical injury. See N.Y. Penal Law § 120.05. The subdivisions requiring explicit intent to cause serious physical injury[4] (1 and 4) are very likely crimes involving moral turpitude. See Nguyen v. Reno, 211 F.3d 692, 695 (1st Cir. 2000) ("It is intrinsically wrong to cause serious physical injury intentionally to another person. We know of no civilian moral code, secular or religious, that permits one to seriously injure another person by assault while intending to do so."). Similarly, subdivisions 2, 7, 8, 9, 10, and 11, which require intent to cause physical injury[5], are likely crimes involving moral turpitude, as an endorsed method of determining such crimes is to look to an evil or malicious intent, see Michel v. INS, 206 F.3d at 263, and an intent to cause someone injury is malicious as well as contrary to accepted rules of morality and the duties owed between people. As for subdivision 6, causing physical injury during the commission or attempted commission of a felony, the BIA (construing a parallel federal statute) has required the underlying felony itself to be a crime involving moral turpitude before it will consider the assault to be such a crime. See Matter of Short, 20 I. & N. Dec. 136, 139 (BIA 1989) ("[I]f a simple assault does not involve moral turpitude and the felony intended as a result

---

[4] "Serious physical injury" is defined in New York as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10.00(10) (McKinney 2005).

[5] "Physical injury" is defined in New York as "impairment of physical condition or substantial pain." N.Y. Penal Law § 10.00(9) (McKinney 2005).

of that assault also does not involve moral turpitude, then the two crimes combined do not involve moral turpitude"). I think it thus fair to say that section 120.05 is a divisible statute. The Second Circuit made this determination in <u>Zaffarano</u> about the predecessor statute. 63 F.2d at 758. There is a strong argument that subdivision 6 can encompass conduct that would not involve moral turpitude, and it is at least possible that intent to cause physical injury (but not serious physical injury) also may not involve moral turpitude. I therefore determine which subdivision of the statute has been violated in this matter by looking to the record of conviction, here, the indictment.

The record of conviction reveals that petitioner pled guilty to the following crime charged in her indictment:

> The grand jury of the County of Kings by this indictment, accuse the defendant of the crime of assault in the second degree (P.L. 120.05) committed as follows: The defendant, on or about January 13, 1994, in the County of Kings, with intent to prevent Daryl Hewitt, a police officer, from performing a lawful duty, caused physical injury to Daryl Hewitt.

<u>See</u> Exhibit 1 to Declaration of AUSA Scott Dunn. The current statutory provision under which petitioner was convicted is subdivision 3:

> With intent to prevent a peace officer, police officer, a fireman, including a fireman acting as a paramedic or emergency medical technician administering first aid in the course of performance of duty as such fireman, an emergency medical service paramedic or emergency medical service technician, or medical or related personnel in a hospital emergency department, from performing a lawful duty, by means including releasing or failing to control an animal under circumstances evincing the actor's intent that the animal obstruct the lawful activity of such peace officer, police officer, fireman, paramedic or technician, he causes physical injury to such peace officer, police officer, fireman, paramedic, technician or medical or related personnel in a hospital emergency department . . .

N.Y. Penal Law § 120.05(3). Removing all the language from the current provision irrelevant to

petitioner's conviction, the current statute reads:

> With intent to prevent a [] police officer . . . from performing a lawful duty . . . he
> causes physical injury to such [] police officer.

The 1933 predecessor statute and the current statute are almost identical except for the requirement of

physical injury in the current statute.

Zaffarano answers the question whether second degree assault in New York is a crime

involving moral turpitude "not necessarily."  63 F.2d at 758.  I think it useful to quote the entire

discussion.

> It has frequently been said that a mere assault does not involve moral turpitude.
> In New York, there are first, second, and third degree assaults.  Section 242, N.Y.
> Penal Law, defines assaults of the second degree in five subdivisions.  Many of the
> crimes so defined plainly involve moral turpitude.  It is conceded that assault with a
> dangerous weapon would be of this character.  But this is not true of all assaults
> included within the section.  Subdivision 5 makes guilty of second degree assault one
> who "assaults another with intent to commit a felony, or to prevent or resist the
> execution of any lawful process or mandate of any court or officer, or the lawful
> apprehension or detention of himself, or of any other person."

> Under this provision a man may be convicted for putting forth the mildest form
> of intentional resistance against an officer attempting to serve lawful process, levy an
> execution on goods, or apprehend or detain the accused or another.  Such conduct,
> though usually meriting punishment more severe than prescribed for a simple assault
> upon a private person not acting in an official capacity, does not necessarily denote
> moral depravity in our opinion.

Zaffarano, 63 F.2d at 758 (citations omitted).

The year before Zaffarano a Southern District court stated its understanding of the statute: "one

may resist an officer in making an arrest through ignorance of the law or for some other ignorance,

thereby making himself liable to conviction of assault, second degree, and yet not be guilty of moral

turpitude."  United States ex rel. Valenti v. Karmuth, 1 F. Supp. 370, 376 (S.D.N.Y. 1932); see also

United States ex rel. Ciccerelli v. Curran, 12 F.2d 394, 395 (2d Cir. 1926) (recognizing that assault in the second degree consummated with a gun is a crime of moral turpitude). A review of the few cases construing the statute since 1933 demonstrates that Zaffarano is the last word on the second degree assault statute from the Second Circuit. Violation of current subdivision 3 would therefore "not necessarily denote moral depravity." Zaffarano, 63 F.2d at 758. See, e.g., United States ex rel. Ciarello v. Reimer, 32 F. Supp. 797, 798 (S.D.N.Y. 1940) (citing Zaffarano and holding that using a deadly weapon may not even raise the second degree assault to a crime involving moral turpitude where there is evidence of provocation).

As noted above, in searching out the intrinsic nature of an offense, courts review the requirement of intent in the statute. No viciousness or maliciousness necessarily inheres in an intent to stop a police officer from effectuating an arrest.[6] The subdivision of the New York assault statute under which petitioner was convicted is strict liability in terms of causing physical injury: "with intent to prevent a police officer . . . from performing a lawful duty . . . he causes physical injury to the police officer." N.Y. Penal Law § 120.05; see People v. Rojas, 97 N.Y.2d 32, 40, 735 N.Y.S.2d 470, 475 (2001) ("a defendant's intent to injure is irrelevant to the crime of assault in the second degree under

---

[6] One of the majority opinions in Michel explicitly noted that the court does not have to identify the hypothetically most innocent manner in which to commit a crime. Michel, 206 F.3d at 265 n.3 (Sotomayor, J.) (noting that there is no requirement to perform the "didactic exercise" of analyzing hypothetical cases); but see Abimbola, 378 F.3d at 176-77 ("We must ask whether every set of facts violating a statute . . . satisfies the criteria for removability, keeping in mind that only the minimum criminal conduct necessary to sustain a conviction under a given statute is relevant") (citations and internal quotation marks omitted). It is not so hard to identify examples where a mishap in the encounter leads to or causes an officer's injury: desperate parents holding off an arresting officer from their only child, or an officer attempting to move a permitless protester lying prone in the street.

Penal Law § 120.05(3). A person who seeks to prevent a police officer from performing a lawful duty is criminally answerable under section 120.05(3) for injuring the officer, even when there is no intent to injure."); People v. Campbell, 72 N.Y.2d 602, 604, 535 N.Y.S.2d 580, 581 (1988) ("Under the plain wording of this subdivision it is evident that a defendant may be convicted even though the injury caused is unintended or accidental. The only proviso is that the injury must occur while the defendant is acting with the intention of preventing the police officer, fireman, paramedic or technician from performing a lawful duty."). Thus, there is no intent to cause injury in the statute, and it apparently remains since 1933 that one can utilize a small amount of force to resist arrest in New York and not commit a crime involving moral turpitude.

The fact that the predecessor statute did not require the police officer to sustain physical injury creates the only doubt about the above analysis. Every subdivision of the predecessor statute was moved to the current statute, however, and the intent to cause physical injury was imported to all of the subdivisions except 3 and 6. Furthermore, the Penal Law revision inserted the requirement of injury into all assaults without changing the nature or severity of any of the crimes. There is no authority, however, for the proposition that the addition of injury to the statute changes the nature of the offense so that it involves moral turpitude. So I conclude that, like the predecessor statute, the current statute is not a crime involving moral turpitude.

Respondents point to the BIA's construction of an Texas aggravated assault statute to support their argument that a conviction under section 120.05(3) is one involving moral turpitude. See Matter of Danesh, 19 I. & N. Dec. 669, 673 (BIA 1988). The BIA in Danesh does appear to have disagreed somewhat with the Second Circuit. But the BIA's conclusion as to a Texas statute is not controlling on

23

this court; the Second Circuit's conclusion about the New York statute at issue here is.  In any event, <u>Danesh</u> is distinguishable.

In <u>Danesh</u>, the BIA construed an aggravated assault statute which required the assaulted police officer to sustain bodily injury.  <u>Danesh</u>, 19 I. & N. Dec. at 670 n.1, <u>citing</u> Tex. Penal Code Ann. § 22.02(a) (Vernon 1979).  In Texas, like New York, that the victim was an officer adds to the seriousness of an assault.  But Texas' statutory assault scheme is different than New York's in a very important way.  The Texas assault statute is violated when a person intentionally, knowingly, or recklessly causes injury to another, threatens another with imminent bodily harm, or causes physical contact with another in an offensive or provocative way.  <u>See</u> <u>Danesh</u>, 19 I. & N. Dec. at 670 n.1; <u>see also</u> Tex. Penal Code Ann. § 22.01(a) (Vernon 2004).  "Intentionally, knowingly, or recklessly" is the required state of mind in each of the statutory provisions regarding assault.[7]  Thus, the intentional nature of the injury or contact in the Texas statute makes it quite unlike the New York provision under which

---

[7] The Texas aggravated assault statute at issue in <u>Danesh</u> provided that "[a] person commits an offense if he commits assault as defined in Section 22.01 of this code *and* he . . . causes bodily injury to a peace officer when he knows or has been informed the person assaulted is a peace officer . . . while the peace officer is discharging an official duty.  Tex. Penal Code Ann. § 22.02(a)(2)(A) (Vernon 1979) (emphasis mine).  Section 22.01 of the Texas Penal Code, the violation of which is a prerequisite to conviction for assault under section 22.02, provides that

> [a] person commits an offense if the person: (1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse; (2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or (3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.

<u>Id</u>. at § 22.01.

petitioner was convicted; the New York statute may be violated without any intent to harm the officer.

Danesh found that the assaulter's knowledge that his victim was a police officer satisfies the requirement that the statute contain the element of intent. But since the Texas scheme requires that the injury to the officer must be intentional anyway, such a finding was an unnecessary departure from earlier BIA precedents, which required the intent element to relate to the inherently immoral criminal act. In Matter of Short, for example, the BIA was analyzing the federal assault statute, and held that assault with intent to commit a felony was not a crime of moral turpitude if the underlying felony was not a crime of moral turpitude. See Short, 20 I. & N. Dec. at 139. That conclusion was drawn from two ideas: i) that simple assault is not a crime of moral turpitude; and ii) that "[t]here must be some particular criminal activity with which to evaluate whether the nature of that activity involves moral turpitude." Id. No case holds that intentionally interfering with an officer's lawful duty is a crime involving moral turpitude without a separate requirement that the perpetrator intend to injure the officer as well.

Intentionally interfering with a police officer's lawful duty is simply not an inherently immoral act. When a person uses the "mildest form of intentional resistance," like the grieving parent might, and ends up causing bodily injury, she is not committing a crime involving moral turpitude. See Campbell, 72 N.Y.2d at 694 ("In short, if a defendant, while intending to prevent one of the persons covered by the statute from performing a lawful duty, causes injury to that person–no matter how or why–he may be found guilty of assault second under subdivision (3)"). Cases construing the statute and finding enough injury to sustain convictions demonstrate that relatively mild force is all that is needed. See, e.g., People v. Sullivan, 284 A.D.2d 917, 918, 728 N.Y.S.2d 320, 322 (4th Dept. 2001) (physical injury requirement satisfied where officer sustained soft tissue injury resulting in severe pain in his ankle and

shin, causing pain and difficulty walking for two days and kept officer out of work for one and one-half

days); People v. Holiday, 249 A.D.2d 624, 625, 670 N.Y.S.2d 986, 987 (3d Dept. 1998)

(requirement satisfied where officer experienced stiffness and swelling in his knee, was unable to move

his leg normally, experienced soreness in his left achilles tendon, missed three days of work, was told to

restrict work to only light duty for several weeks, and was diagnosed with a tear of the lateral meniscus

in his left knee); People v. Sheppard, 202 A.D.2d 701, 702, 609 N.Y.S.2d 318, 319 (2d Dept. 1994)

(requirement satisfied where officer's hand was swollen, black and blue, and stiff, the officer sought

treatment, the injury was painful, and the officer was not able to return to work for four days).

 Lastly with respect to Danesh, the BIA in that case relied on Ciambelli ex rel. Maranci v.

Johnson, 12 F.2d 465 (D.Mass. 1926), for the proposition that it is possible for a second degree

assault perpetrated without a weapon to be a crime involving moral turpitude: "[I]n Ciambelli it was

indicated that a deliberate assault for the purpose of interfering with the performance of an officer's

official duties might be considered as one involving moral turpitude since it evidences an inclination

toward lawlessness." Danesh, 19 I. & N. Dec. at 673. Danesh conflates two separate lines of analysis

from Ciambelli, packaging all the bad acts together in a way which would more likely demonstrate

moral turpitude. Ciambelli, however, said this:

> If one ordinarily law-abiding, in the heat of anger, strikes another, that act would not
> reveal such inherent baseness or depravity as to suggest the idea of moral turpitude. If,
> on the other hand, one deliberately assaulted an officer of the law with a dangerous
> weapon and with felonious intent, or for the purpose of interfering with the officer in the
> performance of his duty, the attendant circumstances showing an inclination toward
> lawlessness, the act might be well considered as one involving moral turpitude.
> Between the two lies the line of demarcation which I do not undertake to define
> accurately.

Ciambelli, 12 F.2d at 466.  Ciambelli would be wrong in the Second Circuit to the extent it looks to the "attendant circumstances" to determine moral turpitude.  This is because, as explained above, courts in the Second Circuit utilize the categorical approach, and "attendant circumstances showing an inclination toward lawlessness" are therefore irrelevant.  The Ciambelli court was discussing a person deliberately assaulting the officer under one of two circumstances: 1) with a dangerous weapon and with felonious intent; or 2) for the purpose of interfering with the lawful duty, and where the circumstances show an inclination toward lawlessness.  In both cases, the assault on the officer is "deliberate," i.e., intentional. In subdivision 3 of section 120.05, there is no deliberate assault, there is an intentional interference with the officer causing injury which is labeled assault.  The Ciambelli court did not think that lawlessness was shown by interference with the officer, but rather that lawlessness could be shown by attendant circumstances, if such circumstances existed.  And the fact that the court in Ciambelli "only determine[d] which side of the line the facts of [that] case [fell]" demonstrates that there could be circumstances of deliberately assaulting an officer which for it would not involve moral turpitude.  See Ciambelli, 12 F.3d at 466.

In Zaffarano, the matter was remanded because the court did not know under which subdivision the noncitizen in that case had been convicted.  The Second Circuit provided what can be characterized as strong guidance on how it might have ruled if it turned out that the conviction in that case was under the subdivision regarding assault on a police officer.  Zaffarano, then, does not contain an actual holding that the current second degree assault on a police officer is not a crime of moral turpitude.  But even if Zaffarano is only the best evidence of the law in this circuit, and therefore there exists some doubt whether Penal Law section 120.05(3) is a crime involving moral turpitude, the rule of

27

lenity requires that doubts be resolved against the government.  See Leocal v. Ashcroft, 534 U.S. __, 125 S. Ct. 377, 384, 160 L. Ed. 2d 271, 282 (2004) (explaining that when interpreting criminal statutes, which have both criminal and noncriminal application, "the rule of lenity applies," even in immigration cases, because the statute must be interpreted "consistently").[8]

I note that moral turpitude is 'measured' against contemporary moral standards and may be susceptible to change.  See United States v. Francioso, 164 F.2d 163 (2d Cir. 1947) (recognizing that "the standard [i]s, not what we personally might set, but the commonly accepted mores: i.e. the generally accepted moral conventions current at the time, so far as we could ascertain them") (citations and internal quotation marks omitted).  Even if contemporary moral standards exist and could be ascertained, a premise for which I have no confidence, the task of measuring such elusive standards is basically impossible.  If, however, we live in a constantly progressing democracy, it must be that what did not involve moral turpitude seventy years ago cannot be said to involve it now.

Reviewing the intent requirement of the statute, and following Zaffarano, I arrive at a finding that subdivision 3 of section 120.05 is not a crime involving moral turpitude.  I therefore recommend denying respondents' motion for summary judgment and finding that petitioner is not ineligible for naturalization because of a conviction for a crime involving moral turpitude.

---

[8] While doubts about an applicant's eligibility for naturalization are resolved in the government's favor, see Berenyi v. District Dir., 385 U.S. at 636-37, doubt about the interpretation of a criminal statute is resolved against the government.  Any doubt in this case is not about petitioner's eligibility for naturalization, rather it is about whether a particular crime involves moral turpitude.  Categorical analysis of the assault statute here cannot be affected by whether it is reviewed in a naturalization or deportation proceeding, or, for that matter, in a criminal context.  There should be only one rule in this jurisdiction whether New York's second degree assault is a crime of moral turpitude.

## IV. Conclusion

For the above stated reasons, I respectfully recommend that respondents' motion to dismiss petitioner's application to the court to accept jurisdiction be denied. I further recommend that the court accept jurisdiction and deny respondents' motion in the alternative for summary judgment. Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. <u>See</u> 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72, 6(a), 6(e).

SO ORDERED.

Dated: Brooklyn, New York
      July 18, 2005

                                                __/s/_____
                                                JOAN M. AZRACK
                                                UNITED STATES MAGISTRATE JUDGE